ROSA PÉREZ CASALDUC ET ALS., demandantes y apelados, v. MANUEL DÍAZ MEDIAVILLA ET ALS., demandados y apelantes.*

No. 4621.—*Resuelto:* Enero 20, 1931.

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SR. TEXIDOR, CON LA CUAL ESTÁ CONFORME EL JUEZ ASOCIADO SR. ALDREY.

Disentimos de la opinión de la mayoría, por entender que

---

* Véase la opinión del Tribunal en la página 260.
* Véase la opinión del Tribunal en la página 734.

en este caso la trasmisión de los bienes de que se trata se hizo por virtud de una transacción, y que una vez que tal transacción fué autorizada por el consejo de familia de los menores, no era necesaria la subasta pública, ni en esa clase de transacciones puede, por regla general, celebrarse tal subasta.

Entre los bienes de la herencia de Don Eusebio Pérez Castillo y Doña Monserrate Rivera se hallaban dos fincas rústicas conocidas por "Santa Bárbara" y "Hornos," radicadas en el barrio de Jayuya Arriba la primera, y en el de Jayuya Abajo la segunda, en el término municipal de Utuado. Estas fincas pasaron, por herencia, a los hijos de Eusebio Pérez y Monserrate Rivera, llamados Pablo, Josefa, Asunción, Eusebio, José Antonio, Emilia y Monserrate Pérez Rivera, y a los nietos, menores de edad, Rosa, Monserrate Rafaela, Rafaela Monserrate, Eduardo y Soledad Pérez y Casalduc.

Los menores antes citados se hallaban bajo la tutela de Don Felipe Casalduc Colón, asistida de un consejo de familia, institución del antiguo Código Civil Español, que rigió en Puerto Rico hasta 1º. de julio de 1902, en cuya fecha empezó la vigencia del actual Código Civil de Puerto Rico. El consejo de familia tenía atribuciones y poderes como los que tienen actualmente las cortes de distrito, en lo que se refiere a tutela. Y entre ellos, la autorización necesaria para transigir y comprometer en árbitros los pleitos o cuestiones en que los menores o incapacitados tengan interés. Apartado 12, artículo 269, Código Civil Español.

Establecemos estos hechos de acuerdo con la certificación del registro de la propiedad y con la de acta del consejo de familia de los menores Rosa, Monserrate Rafaela, Eduardo, Rafaela Monserrate, y Soledad Pérez y Casalduc, inserta en una escritura.

En veinte y cuatro de marzo de 1902, se celebró una sesión del consejo de familia de dichos menores, y se dió cuenta de un escrito del tutor en que pedía autorización para transigir varias cuestiones judiciales que se seguían contra la sucesión de Eusebio Pérez y Monserrate Rivera, de que formaban parte sus pupilos; el tutor exponía la necesidad de evitar más gastos y costas que los hechos, y el riesgo de que vinieran a subasta los bienes que ya estaban embargados, y que dada la crisis de moneda que prevalecía, no habían de obtener buen precio en las subastas, dejando de cubrir los créditos y quedando los deudores ejecutados en peor situación que antes; alegó además que, de acuerdo con los herederos mayores de edad debían transigirse los pleitos pendientes, dando en pago los bienes embargados, y entre ellos las fincas "Santa Bárbara" y "Hornos," sobre la primera de las cuales pesaba un embargo por una alta suma, y sobre la segunda una hipoteca y un embargo, por cantidad considerable. Alegó que seis de los herederos habían convenido en ceder o dar en pago de varias deudas reclamadas judicialmente, al heredero José Antonio Pérez y Rivera, los derechos que les corresponden sobre tales dos fincas "Santa Bárbara" y "Hornos," y el José Antonio Pérez Rivera se obligaba a satisfacer los treinta y cuatro mil seiscientos pesos a que ascendían las deudas, intereses y costas de que tenían que responder las fincas por la hipoteca y embargos, incluyéndose en esa suma lo que el dicho señor había pagado por otros créditos para evitar que continuaran los embargos, y cuyos créditos le habían sido endosados; que creía necesario y útil que los menores cedieran sus derechos por una octava parte sobre tales fincas.

Se oyó por el consejo al pro-tutor que opinó ser útil y necesaria a los menores la cesión; y el consejo resolvió que dados los innumerables procedimientos que se seguían contra

la sucesión y la situación anómala de la Isla, debían transigirse los pleitos y cuestiones; y autorizar al tutor para ceder o dar en pago a José Antonio Pérez y Rivera, para que cubra, en la parte que a los menores tocaba hacerlo de los treinta y cuatro mil seiscientos dólares que pesaban sobre las fincas "Santa Bárbara" y "Hornos," el condominio de dichos menores por la suma igual a la que el cesionario se obliga a pagar a los acreedores, estimando las fincas en $30,000 la primera, y en $4,600 la segunda.

Del registro de la propiedad aparecían sobre la finca "Santa Bárbara" siete anotaciones de embargo, según se relaciona en la inscripción quinta de la finca (folios 46 a 48, transcripción de la evidencia) y en cuanto a la finca "Hornos" una hipoteca a favor del Banco Español de Puerto Rico, por treinta y un mil quinientos treinta y siete pesos y 26 centavos, antigua moneda provincial, con intereses al 8½ por ciento anual, y dos mil pesos para costas y gastos. Inscripción 5 de esa finca, según aparece de las páginas 54, 55 y 56 de la transcripción de evidencia. Y además, un embargo (págs. 56, 57 y 58, T. E.) trabado por el Banco Español de Puerto Rico en pleito contra la sucesión de Eusebio Pérez por $6,922.36 de principal, $1,500 de intereses y $250 por costas, procedentes de préstamo hipotecario, siendo la orden para anotación del embargo de fecha 27 de diciembre de 1901.

En esas condiciones se otorgó la escritura de transacción No. 91, de 8 de octubre de 1902, ante el notario Don Felipe Casalduc y Goicoechea, por la que, de una parte, Don Pablo, Don Eusebio, Doña Josefa, Doña Emilia y Doña Monserrate Pérez y Rivera, y Don Felipe Casalduc Colón, como tutor de los menores hijos de Don Eduardo Pérez y Rivera, Doña Rosa, Doña Monserrate Rafaela, Doña Rafaela Monserrate, Don Eduardo y Doña Soledad Pérez y Casalduc, y acreditando su autorización con la certificación del acta de sesión

del consejo de familia de que hemos hecho aquí relación, por vía de transacción adjudican a Don José Antonio Pérez y Rivera las fincas "Santa Bárbara" y "Hornos" para que con su valor cubra las sumas ya desembolsadas por él en pagos de créditos contra la sucesión de Eusebio Pérez y Monserrate Rivera, y las pendientes que se hallan aseguradas con hipoteca y embargo sobre las dos fincas, inclusos intereses y costas; y José Antonio Pérez y Rivera acepta el contrato comprometiéndose a presentar los recibos de los acreedores por sus créditos, intereses y costas.

Adjudicadas así las fincas a José Antonio Pérez, e inscritas a su favor en el registro de la propiedad por vía de transacción, no es necesario seguir en detalle las trasmisiones sucesivas. Baste decir que el crédito hipotecario que se hallaba constituído a favor del Banco Español de Puerto Rico con otro más constituído por José Antonio Pérez Rivera, fué objeto de reclamación judicial seguida por el acreedor contra el dicho Pérez Rivera, y obtenida sentencia contra éste las fincas fueron vendidas en pública subasta y adjudicadas al Banco acreedor, que las inscribió a su nombre. El Banco vendió las fincas a Don Luciano Ortiz Antón, que obtuvo la inscripción en el registro de la propiedad, quedando los inmuebles hipotecados a favor de la entidad vendedora, por parte del precio. Ortiz y Antón y su esposa vendieron a Miguel de Ramery la finca "Hornos," inscribiéndose en el registro la venta. De esa finca se segregaron dos parcelas: una de 308 cuerdas y 56 centésimas, y otra de 84 cuerdas y 84 centésimas; y las dos fueron vendidas por Ramery a Francisco Parra Capó. Este segregó de la de 308 cuerdas una parte de 8 cuerdas, que vendió; y en cuanto a las otras dos fincas las vendió a Pedro Colón y Rafael Arcelay, inscribiéndolas como finca de 385 cuerdas y 40 centésimas; y ésta fué vendida por Colón y Arcelay a Ma-

nuel Díaz Mediavilla, que es el demandado principal en el presente caso. Esa finca fué hipotecada a favor del Federal Land Bank of Baltimore, en garantía del pago de un préstamo.

La demanda en este caso se basó fundamentalmente en que los demandantes son dueños de una octava parte pro indivisa de la finca "Los Hornos," y en el fondo, en que la trasmisión de la finca a José Antonio Pérez Rivera no existió nunca en derecho, porque no se hizo con autorización legal y por subasta.

El demandado Mediavilla sustancialmente alegó que la trasmisión de la finca a José Antonio Pérez y Rivera, fué inscrita en el Registro de la Propiedad de Arecibo en octubre de 1902, y realizada por las personas que aparecían como dueños en el registro de la propiedad, y que al hacerse la inscripción a favor de José Antonio Pérez se hizo constar que los menores interesados habían tenido la autorización del consejo de familia al tutor después de cumplidos los trámites legales, que de la inscripción no aparecía que los menores tuvieran derecho o interés sobre el inmueble, ni necesitaran autorización judicial, y la finca había sido enajenada repetidas veces, e inscritas las trasmisiones hasta llegar al demandado, sin que de registro resultara defecto alguno que advirtiera a cualquier persona que los menores tenían derecho o interés alguno en la finca; y que el demandado por su propia posesión y la de sus causantes, ha poseído la finca por más de diez años, y todos los demandantes han residido siempre en Puerto Rico.

The Federal Land Bank of Baltimore contestó en la misma forma que Mediavilla, y alegó además que había contratado con éste una hipoteca sobre la finca de que se trata, de buena fe, e inscribiendo su derecho en el registro.

El Código Civil de Puerto Rico empezó a regir el 1°. de julio de 1902. Este código rechazó la institución del consejo de familia que existía en el español, vigente hasta entonces.

Y en las ventas o enajenaciones y gravámenes de bienes de menores o incapacitados, la autorización corresponde a la autoridad judicial.

Entre las disposiciones transitorias, finales del Código Civil de Puerto Rico, encontramos las dos siguientes:

"1. Se regirán por la legislación anterior al Código revisado los derechos nacidos, según ella, de hechos realizado bajo su régimen, aunque dicho Código los regule de otro modo o no los reconozca. Pero si el derecho apareciere declarado por primera vez en el Código Civil revisado, tendrá efecto desde luego, aunque el hecho que lo origine se verificare bajo la legislación anterior, siempre que no se oponga o perjudique a otro derecho nacido o adquirido al amparo de dicha legislación anterior.

"2. Los actos y contratos celebrados bajo el régimen de la legislación anterior, y que sean válidos con arreglo a ella, surtirán todos sus efectos según la misma, sin limitación de ningún género."

La autoridad que para la transacción y la trasmisión de la finca, pidió el tutor al consejo de familia fué obtenida por él en 24 de marzo de 1902, bajo el Código Civil Español, entonces vigente. Que tenía esa autoridad legalmente, es indiscutible. El acto del consejo al autorizar al tutor para la transacción, era perfectamente válido; el tutor adquirió toda la autoridad legal que necesitaba. El hecho de que otro Código Civil fuera puesto en vigor con posteridad a tal autorización, no anulaba ésta, ya que de una manera expresa la disposición transitoria segunda del mismo nuevo código, que acabamos de citar, estableció que los actos y contratos celebrados bajo el régimen de la legislación anterior "surtirán todos sus efectos, según la misma, sin limitación de ningún género." Esas palabras de la ley "sus efectos según la misma" referidas a la legislación anterior, nos llevan a aplicar el antiguo código, que es esa legislación anterior, y a ver qué efectos producía, con arreglo a él, la autorización.

El artículo 269 del Código Civil Español fijaba los casos en que el tutor necesitaba autorización del consejo de familia, y entre ellos; en el apartado 12, se decía:

"Para transigir y comprometer en árbitros las cuestiones en que el menor o incapacitado estuviere interesado."

La situación, en los momentos en que el tutor acudió al consejo, era ésta:

(*a*) Los menores bajo su tutela tenían participación indivisa en esta finca "Los Hornos."

(*b*) La finca "Los Hornos" se hallaba sujeta a gravámenes y embargos, por razón de créditos contra el causante de la sucesión, y luego la sucesión misma.

(*c*) José Antonio Pérez y Rivera, había pagado algunos créditos contra la sucesión.

(*d*) Los acreedores tenían el derecho de perseguir y ejecutar los bienes, entre ellos, esa finca "Los Hornos."

(*e*) Los acreedores estaban dispuestos a tratar con José Antonio Pérez y Rivera, acerca de la solución de sus créditos, sin ejecutar las fincas.

(*f*) En la transacción se evitaban posteriores procedimientos judiciales, nuevas costas y nuevos gastos.

No tenemos duda alguna de que se trataba de una transacción, contrato por el que las partes dan, prometen o retienen cada una alguna cosa, y evitan la provocación de un pleito, o ponen término al ya comenzado. Los acreedores, de una parte, debían recibir pagos; la otra parte, que en realidad era la sucesión de Eusebio Pérez, recibía el descargo de sus deudas, y el beneficio de las costas y gastos nuevos, sin otra acción ulterior de parte de los acreedores. No importa el papel que desempeñara José Antonio Pérez y Rivera. Los créditos, en cuanto a la sucesión afectaban, se extinguían, y lo mismo los embargos y gravámenes, y las responsabili-

dadés personales para el caso de que los bienes gravados o embargados no fueran suficientes a cubrir los créditos.

Es de considerar también cuál era la verdadera posición de los menores con respecto a esta finca. En ella tenían un derecho, indiviso, de una octava parte. Sobre esta finca y otra pesaba una hipoteca que, en su origen fué por un valor de 31,537.26 pesos, antigua moneda provincial, que se había reducido por razón de algún o algunos pagos; y un embargo, por 6,922 dólares y 26 centavos de principal, 1,500 dólares por intereses, y 250 dólares para costas, procedentes del mismo crédito hipotecario. La finca se hallaba valorada, según aparece del registro, en cuarenta mil pesos de la antigua moneda provincial, según la inscripción 5 (páginas 54, 55 y 56, T. R.) y posteriormente, inscripción 7 (páginas 58 y 59, T. R.) en ocho mil dólares. Notamos que parece ser que la participación de los menores no pasaba de mil dólares; y su responsabilidad en los gravámenes era de otros mil dólares, cuando menos.

No vemos que se hubiera hecho una adjudicación específica, de parte determinada, a los menores: un tanto sobre la finca es todo lo que ellos tenían como un derecho sobre el inmueble.

En las condiciones en que la sucesión se hallaba, y en las condiciones en que se encontraba la participación de los menores, que como un bien era problemática, ya que tenía la finca un embargo como el que hemos anotado, la transacción al consejo propuesta y por él autorizada, cediendo todos los interesados sus derechos a uno de los herederos que se encargaba del arreglo y solución de los créditos, era la razonable, y quizá la única posible. Un acreedor tenía un embargo que había de convertirse en ejecución; y ciertamente no iba a buscar acuerdos erizados de dificultades técnicas, teniendo en sus manos el cobro sobre la finca, y la facilidad de ir contra los demás bienes de sus deudores, por el balance insoluto de su crédito.

Para transigir fué dada la autorización, y para ese mismo contrato pasaron a poder de José Antonio Pérez y Rivera las participaciones que en la finca "Los Hornos" y en la "Santa Bárbara" tenían los herederos de Eusebio Pérez.

En estas condiciones se otorgó la escritura de 8 de octubre de 1902, que se inscribió en el Registro de la Propiedad de Arecibo.

Entramos en el examen del punto que nos parece más importante en este caso.

Los artículos 33 y 34 de nuestra Ley Hipotecaria, leen como sigue:

"Artículo 33. La inscripción no convalida los actos o contratos que sean nulos con arreglo a las leyes.

"Artículo 34. No obstante lo declarado en el artículo anterior, los actos o contratos que se ejecuten u otorguen por persona que en el Registro aparezca con derecho para ello no se invalidarán en cuanto a tercero, una vez inscritos, aunque después se anule o resuelva el derecho del otorgante en virtud de título anterior no inscrito o de causas que no resulten claramente del mismo Registro.

"Solamente en virtud de un título inscrito podrá invalidarse, en perjuicio de tercero, otro título posterior también inscrito, salvo lo dispuesto en el artículo 389.

"Lo dispuesto en este artículo no será aplicable en ningún tiempo al título inscrito con arreglo a lo prevenido en el artículo 390, a menos que la prescripción haya convalidado y asegurado el derecho a que se refiera dicho título."

El artículo 34 que citamos es uno de los más discutidos y comentados de la ley. Era evidente que la circunstancia de hallarse inscrito un acto, o un contrato aparente, realizados en violación de la ley, no podría hacerlos prevalecer como buenos y perfectos. Pero, como la Ley Hipotecaria es de garantía con respecto a terceros, y como para la inscripción de actos y contratos, se exigen requisitos estrictos y la intervención y calificación de documentos por un registrador abogado, que tiene la facultad de negar la inscripción a los actos

y contratos nulos, tenía que darse valor y eficacia a la inscripción ya hecha, si de ella no resultara un vicio que hiciera nulo el acto o contrato. Si resultara, el futuro comprador, y el adquirente de derechos sobre la finca así inscrita, adquiriría a sabiendas de la existencia de una causa de nulidad, de la que estaba avisado por el mismo registro de la propiedad; y si la causa no resultara de la inscripción, el adquirente se hallaría protegido por ese hecho.

¿Resulta de la inscripción original a favor de José Antonio Pérez y Rivera una causa de nulidad? En este mismo caso se está discutiendo si tratándose de una transacción, era indispensable la subasta pública, y si en realidad hubo una enajenación al tratarse de una participación indivisa en una finca gravada con exceso tal que su valor desaparecía bajo el gravamen. De manera que el extremo no es fácil para determinar; es un punto de ley que requiere serios conocimientos en ella, para determinar y resolver. Por esto, el artículo 34 no habla simplemente de causas que no resulten del mismo registro, sino de "causas que no resulten *claramente* del mismo registro" (itálicas nuestras). Porque no se trata de requerir el estudio de un abogado experto en Ley Hipotecaria, sino de que cualquiera persona de mediana instrucción pueda ver si resulta, o no, del registro, la causa de nulidad. La interpretación hecha por la jurisprudencia está de acuerdo con esta teoría. Así, en el caso *Ayllón y Ojeda et al.* v. *González y Fernández et al.*, 28 D.P.R. 67, se dijo:

"Interpretamos el artículo 33 en el sentido de significar que una escritura que ya es nula no adquiere fuerza alguna por el hecho de su inscripción en el registro de la propiedad. En otras palabras, si es nula o anulable, continúa siéndolo. Sin embargo, el artículo 34 es uno de los principales artículos de la Ley Hipotecaria que protege los derechos de terceros. Una persona que adquiere de otra cuyo título está inscrito en el registro está protegida, a no ser que exista un claro defecto en el registro de la propiedad. *El Pueblo* v. *Riera,* 27 D.P.R. 1; *Sánchez* v. *Hartzell et al.*, 26 D.P.R. 684. La corte infe-

rior hace cierta insistencia en cuanto a la diferencia que existe entre las palabras 'aparezcan' y 'resulten,' tal como se usan en el referido artículo. Entendemos que las dos palabras son sinónimas para los fines de esta Ley, criterio que está robustecido por el hecho de que en la traducción hecha por el Departamento de la Guerra, la palabra 'resultar' ha sido traducida por 'appear.'

Esta sentencia fué en definitiva confirmada por el Tribunal Supremo de los Estados Unidos en *B. Fernández & Bros., Sucrs., et al.* v. *Ayllón y Ojeda,* 266 U. S. 144, revocando la de la Corte de Apelaciones para el Primer Circuito. En esta decisión no se discute explícitamente el artículo 34 de la Ley Hipotecaria de Puerto Rico, pero se dice:

"... La cuestión a dirimir es si los demandados poseían con título 'justo' o 'propio,' según se le designa indistintamente, dentro del significado de la ley que determina la prescripción de diez años en tal caso, en vez de los treinta años para los cuales no se precisa justo título. Según observó la corte de Puerto Rico, un justo título no significa un título perfecto, pues de otro modo no sería menester la prescripción. Véase *United States* v. *Candler-Dunbar Water Power Co.,* 209 U. S. 447, 450. Si el título es bueno por su propia faz, y el poseedor a virtud del mismo no tiene conocimiento de ningún defecto extrínseco, fundará un buen título en diez años. La orden de venta no revelaba defecto alguno, y la Corte Suprema resolvió que, toda vez que fué librada por una corte con jurisdicción sobre los menores y el tutor, según hemos indicado, los compradores no estaban obligados a investigar más. No tenían conocimiento real de las omisiones del tutor, y, para los fines de una posesión de buena fe, eso satisface a la ley. Ellos tenían derecho a asumir que todos los requisitos necesarios habían sido cumplidos. No necesitamos considerar la observación adicional de la corte, también digna de respetarse, de que la omisión de inscribir en el registro de tutelas y de prestar fianza no anulaba la venta."

Conviene anotar aquí esta parte de la opinión, por la íntima relación entre la doctrina de "justo título," y el contenido del artículo 34 de la ley hipotecaria.

En el caso *José A. Pérez Rivera et al.* v. *Jaime Colom, et al.,* 40 D.P.R. 397, se dijo por este tribunal:

"Los apelados contestan alegando que la fecha de la adjudicación

no aparecía del registro mismo, sino en el asiento de presentación o inicial existente en el registro. Convenimos con los apelados y con la cuidadosa opinión emitida por la corte inferior en que el defecto no aparecía claramente del registro. Un comprador en perspectiva no está obligado a examinar todos los libros del mismo. El asiento de presentación es de naturaleza temporal o volátil. Lo que importa es el récord permanente. Los compradores de fincas en Puerto Rico tienen derecho a asumir que el registrador cumplió con su deber y que inscribió en sus libros principales todo lo que era necesario transcribir. Por estar relacionados con la proposición principal, pueden reproducirse los siguientes casos, algunos de los cuales fueron citados por la corte inferior: *Vélez* v. *Camacho*, 8 D.P.R. 37; *El Pueblo* v. *Riera*, 27 D.P.R. 1; *Ayllón* v. *González*, 28 D.P.R. 67; *Menéndez* v. *Cobb*, 28 D.P.R. 775; *Gutiérrez* v. *Pons*. 32 D.P.R. 695; *González* v. *Anglada*, 33 D.P.R. 1021.''

En el caso *Menéndez* v. *Cobb et al.*, 28 D.P.R. 775, se dijo:

''Por el solo hecho de que en la inscripción no se diga que el demandado fué citado en debida forma, no puede sostenerse que el tercero supo que no fué citado, pues pudo haberlo sido aunque no lo diga la inscripción. El artículo 34 de la Ley Hipotecaria exige de modo categórico que las causas de nulidad resulten claramente del mismo registro, y por tanto los hechos de los cuales resulten deben aparecer en él afirmativa y claramente.''

Siguiendo tal doctrina, y tal razonamiento, sería preciso que hubiéramos visto que las causas de nulidad resultaban afirmativa y claramente del mismo registro, para que nos decidiéramos a confirmar la sentencia apelada, declarando de ese modo que los sucesivos adquirentes de la finca tenían noticia legal de la existencia de determinadas faltas o causas de nulidad. Y a nuestro juicio, no resultan tales causas, de manera afirmativa, y claramente. Y sobre los méritos de una inscripción en el registro, de la que no aparecen afirmativa y claramente causas de nulidad, se realizan las adquisiciones posteriores de la finca, la que poseen por largos años los sucesivos adquirentes, de buena fe, y sin que los pretendidos partícipes en la propiedad hagan reclamación alguna a los poseedores.

El Tribunal Supremo de España, en sentencia de 25 de noviembre de 1890, caso Ramón Valdés contra el Ayuntamiento de Oviedo, tomo 68 Jurisprudencia Civil, páginas 426 a 432, sostuvo que

". . . el principio jurídico de que lo que es nulo desde su origen no puede convalecer por el transcurso del tiempo, no es ilimitado o absoluto, y sólo debe entenderse aplicable, según tiene declarado el Tribunal Supremo, cuando la ley, dadas ciertas circunstancias, no reconoce o crea un derecho que hay que respetar."

El demandado Mediavilla, y su esposa, han comprado de quien en el registro de la propiedad aparecía como dueño, y con derecho o título para vender y trasmitir, sin que de los asientos del registro resulte clara y afirmativamente causa de nulidad. Ellos poseen con justo título, quieta y pacíficamente como dueños, y de buena fe, por tiempo superior a diez años, tiempo en el que los ahora demandantes aparecen haber vivido en Puerto Rico, y durante el que no han presentado reclamación alguna, judicial o extrajudicial. Innecesario citar aquí todos los casos en que hemos declarado lo que es justo título. Baste la antes citada decisión de la Corte Suprema de los Estados Unidos en el caso Ayllón, o sea *B. Fernández & Bros. Sucrs., et al.* v. *Ayllón y Ojeda,* en la que se confirma la declaración de lo que es justo título, sentada por este tribunal, en el sentido de que no significa título perfecto; y de que si es válido en su faz, y el poseedor no tiene noticia de algún defecto extrínseco, sostendrá un título válido después de diez años.

En el caso *Martorell et al.* v. *J. Ochoa y Hermano,* 25 D.P.R. 759, se dijo por este tribunal:

"Por lo que atañe al justo título, por modo expreso dice el artículo 1853 que se entiende por tal el que legalmente baste para transferir el dominio o derecho real de cuya prescripción se trate. Para que el título sea justo no es necesario que de hecho transfiera el dominio o derecho real sino que sea suficiente para transferirlos, *aunque adolezca de un vicio que lo invalide.* Y tiene que ser así, porque si bajo el nombre de justo título que la ley exige para la

prescripción, viniera comprendido solamente un título adornado de todos los requisitos así internos como externos necesarios para la transmisión real y positiva del dominio, abundaría la prescripción como medio adquisitivo del dominio. . .

\*    \*    \*    \*    \*    \*    \*

"El mismo tribunal en sentencia posterior de 30 de noviembre de 1910, establece 'que aun en el supuesto de que una escritura no hubiera podido transmitir al comprador la propiedad de los bienes reclamados por la nulidad del título que el vendedor ostentara, si dicha escritura, además de reunir los requisitos externos que la ley requiere constituye por su naturaleza un título traslativo de dominio, es manifiesto que se llenen en ella las condiciones establecidas en los artículos 1952 y 1953 del Código Civil (1853 y 1854 del Revisado), como así lo tiene proclamado esta Sala en casos análogos, porque de exigirse que el título invocado transmitiera de hecho y de derecho el dominio de la cosa al comprador, no tendría para qué acudir éste a la prescripción, y este modo de adquirir, por lo que respecta a la prescripción ordinaria, sería superfluo y habría que borrarlo por innecesario e inútil de entre todos los admitidos por nuestra legislación positiva.' Jurisprudencia Civil, tomo 119, página 486."

En la misma decisión *Martorell* v. *Ochoa* se habla del concepto de la buena fe, en estos términos:

"En el artículo 1851 define el concepto de la buena fe, el cual consiste en la creencia de que la persona de quien recibió la cosa el poseedor, era dueño de ella y podía transmitir su dominio. Para la buena fe basta la creencia indicada y no es necesario el hecho real y positivo de que la persona de quien el poseedor recibió la cosa fuera en efecto dueño de ella y pudiera transmitir su dominio. Ese concepto de la buena fe concuerda con el artículo 436 aplicable a la prescripción, lo mismo que el 437, por precepto terminante del 1852, cuyo artículo 436 establece que se reputa poseedor de buena fe al que ignora que en su título o modo de adquirir exista vicio que lo invalide, reputándose poseedor de mala fe al que se halla en el caso contrario. Y según el artículo 437 la buena fe se presume siempre y al que afirma la mala fe de un poseedor corresponde la prueba. De modo que es poseedor de buena fe el que cree que adquirió la cosa de quien era dueño de ella y podía transmitir su dominio, o el que ignora que en su título o modo de adquirir existiera vicio que lo invalidara. Así es que la buena fe es compatible con

un título, afectado por un vicio que lo invalide, siempre que se ignore la existencia del vicio por el poseedor o éste crea que no existe.''

Adquirida esa finca en la forma que hemos dicho, poseída por los sucesivos adquirentes sin interrupción por más de diez años entre presentes, sumándose al tiempo de posesión del actual poseedor el de sus predecesores y causantes, entendemos que la prescripción establecida por los artículos 1831, 1841, 1842, 1851, 1853, 1854 y 1858 del Código Civil de Puerto Rico, protege a los demandados.    Cítase en cuanto al tiempo de la prescripción, el mismo Código en su artículo 1861.

Por estas razones, entendemos que debe revocarse la sentencia apelada, dictándose otra por la que se declare sin lugar la demanda.

Estoy autorizado para decir que el Juez Asociado Sr. Aldrey está conforme con esta opinión.