Ricardo Enrique Rafael Rubio Sacarello, etc., demandantes y recurrentes, *v.* Antonio A. Roig, sustituido por sus herederos Antonio y Gladys Roig Oppenheimer y su viuda Angelina Oppenheimer, demandados y recurridos.

*Número:* 12290   *Resuelto:* 4 de enero de 1962

*Arturo O'Neill,* abogado de los recurrentes, *Francisco González, Jr.,* abogado de los recurridos.

Sala integrada por el Juez Presidente señor Negrón Fernández como Presidente de Sala y los Jueces Asociados señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

En 31 de marzo de 1932 la anterior Corte de Distrito de San Juan dictó sentencia en una acción sobre reclamación de alimentos interpuesta por Carmen Sacarello contra Ricardo Rubio Ríos condenando al demandado a satisfacer a la demandante una pensión mensual de $75.00 a partir del día 1 de diciembre de 1931.[1] El mismo tribunal había condenado a Rubio en 2 de febrero de 1932 por el delito de abandono de menores consistente en que no sufragaba los alimentos para su hijo menor Ricardo Enrique Rubio Sacarello, y le impuso una pena de 90 días de cárcel, dejándola en suspenso siempre que el acusado depositara, comenzando con el mes de febrero de 1932, la suma de $50.00 mensuales.[2]

Mediante la escritura número 37 de 17 de mayo de 1933 otorgada ante el Notario Pablo Andino Espejo, después de hacer referencia a las sentencias ya mencionadas, don Ricardo Rubio y doña Carmen Sacarello manifestaron que "han llegado a un acuerdo por una suma determinada que será garantizada con hipoteca a fin de con ella poder atender a la manutención de la señora Carmen Sacarello y de su hijo menor". Al efecto, Rubio reconoció a favor de la señora Sa-

[1] La reclamación se interpuso bajo las disposiciones del artículo 109 del Código Civil, ed. 1930, que para la fecha de la sentencia concedía facultad al tribunal para asignar alimentos a la mujer que hubiese obtenido el divorcio "de los bienes que sean de la propiedad del marido sin que pueda exceder la pensión alimenticia de la tercera parte de la renta de aquéllos." Posteriormente, mediante la Ley Núm. 90 de 5 de mayo de 1948, pág. 203, 31 L.P.R.A. sec. 385, se enmendó dicho artículo para que pudieran considerarse para la fijación de la pensión "los ingresos, rentas, sueldos o bienes que sean de la propiedad del marido".

La prueba en el caso de alimentos reveló que Rubio tenía bienes privativos que le producían una renta líquida de $264.76 mensuales. Confirmamos la sentencia en apelación. *Sacarello* v. *Rubio*, 44 D.P.R. 883 (1933).

[2] Esta sentencia fue también confirmada en apelación. *Pueblo* v. *Rubio*, 44 D.P.R. 889 (1933).

carello, "para su alimentación y la de su hijo menor", la suma de $5,500, que se obligó a satisfacer dentro del plazo de un año, con intereses a razón del doce por ciento anual pagaderos por mensualidades vencidas. La otorgante convino en desistir del pleito en reclamación de alimentos permanentes y presentar una moción en el caso sobre abandono de menores "haciendo constar bajo juramento que la sentencia ha sido satisfecha y cumplida en cuanto a la pensión". Para garantizar el pago de la suma principal de $5,500, sus intereses al tipo estipulado y un crédito de $500 para costas en caso de ejecución, Rubio constituyó primera hipoteca voluntaria a favor de la señora Sacarello, sobre una finca de su propiedad situada en los barrios de Antón Ruiz y Mambiche, de Humacao. Se convino además que la acreedora hipotecaria no reclamaría suma alguna por concepto de costas dentro del pleito civil antes mencionado ya que con la "cantidad recibida" sufragaría las costas en que hubiese incurrido, incluyendo los honorarios del abogado que la había representado. En la escritura también se hizo constar que doña Carmen Sacarello había recibido la suma de $275.00 que se había consignado en la Secretaría de la Corte de Distrito de San Juan a cuenta de las pensiones del menor.

Presentada esta escritura en el Registro de la Propiedad de Humacao, se inscribió mediante asiento que en su parte pertinente lee como sigue:

". . . Y por el documento que motiva la presente dicho Ricardo Rubio Ríos, mayor de edad, divorciado, propietario y vecino de Humacao, reconoce a favor de doña Carmen Sacarello, mayor de edad, sin profesión especial, divorciada y vecina de San Juan, para su alimentación y la de su hijo menor la suma de cinco mil quinientos dólares que se compromete a pagarle dentro del plazo de un año a contar desde el diez y siete de mayo de mil novecientos treinta y tres y devengando dicha cantidad el interés del doce por ciento anual pagadero por meses vencidos hasta su pago definitivo, cuya cantidad acepta la referida señora Carmen Sacarello, obligándose a desistir del pleito de alimentos permanentes y a radicar una moción en el caso del El Pueblo de Puerto

Rico contra Ricardo Rubio por abandono de menores haciendo constar bajo juramento que la sentencia ha sido satisfecha y cumplida en cuanto a la pensión y consintiendo también en que se cancele el embargo sobre bienes del señor Rubio. . . . Es expresamente convenido que la señora Sacarello podrá (reclamar) digo, no podrá reclamar nada por costas en el pleito civil antes mencionado al Señor Rubio, pues con la cantidad recibida ella se obliga a pagar sus costas, y los honorarios de su abogado . . . La señora Sacarello reconoce a favor de su abogado don Ricardo H. Blondet, un crédito de un mil quinientos dólares en cuya cantidad están comprendidos sus honorarios en todos los pleitos en que la ha representado, las costas, por él suplidas y todos los desembolsos y cuya cantidad le hará efectiva cuando pague el señor Rubio la referida hipoteca. . . . . ."

En 1 de agosto de 1933 la señora Sacarello y el licenciado Blondet cedieron el crédito hipotecario a Edmond Block, (³) incluyendo la mensualidad de intereses que se había comenzado a devengar en 18 de julio. Block inició procedimiento sumario para el cobro del crédito hipotecario, y cuando estaba únicamente pendiente el trámite de subasta judicial, lo cedió al señor Antonio A. Roig, quien continuó hasta su terminación definitiva la ejecución, que culminó con la adjudicación a su favor del inmueble hipotecado. Tanto las cesiones como la adjudicación fueron oportunamente inscritas.

En enero de 1937, los hermanos Enrique José, Ivette y Margarita Amalia Rubio González y Amalia González viuda de Rubio, en su carácter de herederos de don Ricardo Rubio Ríos iniciaron una acción para reivindicar la finca ejecutada y adjudicada a Roig. Se incluyó como demandados al poseedor señor Roig y a Ricardo Enrique Rubio Sacarello, por haberse negado este último a figurar como demandante. Se alegó la nulidad del título de Roig fundándose en la "inexistencia" del crédito hipotecario que dio margen a la ejecución,

(³) En la escritura de cesión se hizo constar en la parte expositiva que "el señor Ricardo Rubio *reconoció adeudar* a la compareciente doña Carmen Sacarello, la cantidad de cinco mil quinientos dólares".

derivada dicha "inexistencia" en que representaba una transacción sobre "alimentos pasados y por venir" y a que todo ello aparecía del Registro de la Propiedad, imputándosele, por tanto, conocimiento de estos hechos a los sucesivos adquirentes. Se emplazó a doña Carmen Sacarello en su carácter de madre con patria potestad sobre su hijo menor demandado. Tres años después, doña Amalia González, personalmente y en representación de sus tres hijos demandantes, y doña Carmen Sacarello, en representación de su hijo menor Ricardo Rubio Sacarello—únicos y universales herederos de don Ricardo Rubio Ríos—comparecieron al tribunal con una solicitud para que se les autorizara a transigir el litigio entablado. Celebrada la vista correspondiente, el tribunal accedió a ello, y mediante la consignación de la suma de $2,000 por el demandado Roig para ser distribuida entre los cuatro menores mencionados, se otorgó "renuncia a favor del señor Antonio A. Roig, por la señora Amalia González viuda de Rubio y sus hijos los demandantes Rubio González y por la demandada Carmen Sacarello y su hijo Ricardo Enrique Rafael Rubio y Sacarello, de todo derecho, interés y participación que puedan tener en la finca afectada por el litigio". De las constancias de los autos de dicho pleito aparece que las sumas consignadas a favor de los menores fueron retiradas mediante mociones suscritas por sus respectivas madres para atender necesidades de aquéllos y satisfacer honorarios de abogado.

Quince años después, los cuatro hijos de Ricardo Rubio Ríos presentaron una nueva acción reivindicatoria contra el señor Roig en la cual se formulan sustancialmente las mismas alegaciones que en el pleito anterior, y además, específicamente se ataca la validez de la transacción efectuada y de la sentencia dictada en dicha acción reivindicatoria. El tribunal de instancia declaró sin lugar la demanda, y se interpuso apelación.

# I

Prescribe el artículo 1713 del Código Civil, ed. 1930, 31 L.P.R.A. sec. 4825, que no se puede transigir sobre alimentos futuros. Scaevola([4]) comenta que esta prohibición es razonable "dado al alcance de los alimentos, que son un derecho de tracto sucesivo, de cuantía variable y trascendencia a la vida o subsistencia de las personas, con características frecuentemente de interés público." Castán([5]) la justifica fundándose en que el derecho a la vida es irrenunciable. ■■

Según las propias alegaciones de los demandantes su propio causante realizó el acto de transigir, *como alimentante*, sobre alimentos futuros y además el acto ilícito de constituir una hipoteca en garantía de la suma que reconoció adeudar con motivo de dicha transacción. Llanamente, los demandantes pretenden ampararse en la ilicitud de los actos ejercitados por su causante para demandar de los tribunales de justicia la nulidad de dichos actos. Ahora bien, los actos ejecutados contra lo dispuesto en la ley son nulos conforme ordena el artículo 4 del Código Civil, 31 L.P.R.A. sec. 4, *Sánchez v. Coll*, 69 D.P.R. 925 (1949); *Compañía Popular v. Corte*, 63 D.P.R. 121 (1944); pero el autor o participante del acto ilícito no puede recurrir al juez en demanda de su nulidad. Así lo prescribe la máxima *Nemo auditur suam turpitudinem allegans*, que halla expresión positiva en los artículos 1257 y 1258 del Código Civil, 31 L.P.R.A. secs. 3516 y 3517.([6]) Igual impedimento alcanza a los causahabientes

---

([4]) Q. Mucius Scaevola, *Código Civil*, ed. 1953, tomo XXVIII, pág. 346.

([5]) José Castán Tobeñas, *Derecho Civil Español, Común y Foral*, 8va. ed., (1954) tomo 4to., pág. 741.

([6]) Dichos artículos leen como sigue:

"Artículo 1257.—[*Cuando provenga de ser ilícita la causa u objeto del contrato.—Si el hecho constituye delito o falta común a ambos contratantes.*] —Cuando la nulidad provenga de ser ilícita la causa u objeto del contrato, si el hecho constituye un delito o falta común a ambos contratantes, carecerán de toda acción entre sí, y se procederá contra ellos, dándose además a las cosas o precio que hubiesen sido materia del contrato, la aplicación prevenida en el Código Penal respecto a los efectos o instrumentos del delito o falta.

y herederos de dicho autor o participante, sentencias del Tribunal Supremo de España, de 9 de marzo de 1900 (Jurisp. Civil, tomo 89, pág. 347) y 6 de mayo de 1902, venta de bienes reservables hecha por el padre en perjuicio de su hijo (Jurisprudencia referente al Código Civil, Tomo X, pág. 552). ▮

Pérez y Alguer,[7] al referirse a disposiciones idénticas del Código Español—artículos 1305 y 1306 del Código Civil Español—dicen "El que es culpable de la ilicitud carece de todo derecho y acción: *nemo auditur suam turpitudinem allegans, nemo de improbitate sua consequitur actionem* (citas), principios que, aplicados al contrato ya ejecutado, constituyen una excepción singular a la regla de la nulidad radical del negocio ilícito." Dualde[8] indica que "La causa ilícita no es causa contractual. De suerte que el contrato se frustra en su generación. Las transmisiones efectuadas en estas condiciones no están sujetas al régimen general del enriquecimiento sin causa sino al régimen especial de *'nemo auditur'* al que responden los artículos 1305 y 1306. El contratante exento de torpeza puede ejercitar la *in rem verso*, o de enriquecimiento sin causa mientras que el contratante incurso en torpeza, ni puede reclamar ni pedir el cumplimiento de

---

["*Si hubiere delito o falta de parte de uno de los contratantes.*]—Esta disposición es aplicable al caso en que sólo hubiere delito o falta de parte de uno de los contratantes; pero el no culpado podrá reclamar lo que hubiese dado, y no estará obligado a cumplir lo que hubiera prometido.

· "Artículo 1258.—[*Si no constituye delito ni falta.*]—Si el hecho en que consiste la causa torpe no constituyere delito ni falta, se observarán las reglas siguientes:

["*Cuando ambos contratantes son culpables.*]—1. Cuando la culpa esté de parte de ambos contratantes, ninguno de ellos podrá repetir lo que hubiera dado a virtud del contrato, ni reclamar el cumplimiento de lo que el otro hubiese ofrecido.

["*Cuando lo es uno solo.*]—Cuando esté de parte de un solo contratante, no podrá éste repetir lo que hubiese dado a virtud del contrato, ni pedir el cumplimiento de lo que se le hubiera ofrecido. El otro, que fuera extraño a la causa torpe, podrá reclamar lo que hubiera dado, sin obligación de cumplir lo que hubiera ofrecido."

[7] Notas a Ennecerus, Kipp y Wolff, *Tratado de Derecho Civil*, ed. 1950, tomo I—2º, pág. 378.

[8] Joaquín Dualde, *Concepto de la Causa de los Contratos*, Barcelona (1949), pág. 191.

lo prometido." Manresa(⁹) aclara que aunque el artículo 1306 se refiere a la causa, "por la conexión de ésta con el objeto y por la analogía con el 1305", son aplicables las mismas consecuencias a las causas en que la ilicitud procede del elemento objetivo del contrato. En el mismo sentido se pronuncian Castán,(¹⁰) Scaevola(¹¹) y Valverde.(¹²) Véase, Ferrara, *El Negocio Jurídico*, trad. de Manuel Albaladejo, pág. 502 y ss. La jurisprudencia del Tribunal Supremo de España es categórica al respecto. Así, en su sentencia de 11 de noviembre de 1895 (Jurisp. del C. Civil, págs. 584, 593) declara que "aun cuando el art. 1.302 del Código Civil concede la acción de nulidad de los contratos a los obligados principal o subsidiariamente en virtud de ellos, este principio, que tiene su desenvolvimiento en los artículos siguientes, se halla modificado, en los casos en que la nulidad provenga de causa torpe o ilícita, por los artículos 1305 y 1306, que niegan toda acción entre sí a los contratantes culpables, sea o no el hecho constitutivo de delito o falta. ■■

Hace apenas un día invocamos la regla de *nemo auditur* en relación con una reclamación derivada de un contrato de apuesta y nos negamos a amparar a una parte que exigía el cumplimiento de lo prometido al ser agraciada en una rifa patrocinada por la parte demandada. *Serra* v. *Salesian Society y Riu*, 84 D.P.R. 322 (1961); cf. *Saavedra* v. *Saavedra*, 46 D.P.R. 232, 234 (1934); *Fernández* v. *Laloma*, 56 D.P.R. 367, 380–381 (1940). Y es que quien hace estado de su propia torpeza no merece ser atendido por los tribunales. El legislador prefiere que se mantenga la situación de hecho resultante del acto ilícito antes que dar acceso a los tribunales a la demanda de nulidad del acto contrario a la ley en el cual

---

(⁹) José Ma. Manresa, *Comentarios al Código Civil Español*, 4ta. ed., tomo VIII, pág. 717.

(¹⁰) José Castán Tobeñas, *op. cit.*, tomo 3, pág. 440.

(¹¹) Q. Mucius Scaevola, *Código Civil*, 1904, tomo XX, pág. 1007 y ss.

(¹²) Calixto Valverde y Valverde, *Tratado de Derecho Civil*, tomo I, págs. 558 y ss.

el demandante ha sido autor o copartícipe. (¹³)  *Possessiones melior condictio habetur*.

Presumiendo que el contrato efectuado entre las partes fuere uno de transacción sobre alimentos futuros en garantía de cuyo pago se constituyó la hipoteca que luego fue ejecutada y culminó en la adjudicación de los bienes hipotecados a favor del demandado Roig, es claro que en el acto inicial medió "torpeza" de parte del causante de los demandantes. Por tal motivo, sus herederos están impedidos de reclamar ahora fundándose precisamente en el acto contrario a la ley en el cual su propio padre fue, sino el actor principal, cuando menos su copartícipe. Además, quien debe garantía no pueda exigirla. ■

## II

Existe otro motivo adicional por el cual los demandantes no pueden prevalecer, aun presumiendo que el contrato de transacción que dio origen al de hipoteca fuera inexistente. Examinada la inscripción registral que produjo la presentación de la escritura de hipoteca otorgada entre Ricardo Rubio, causante de los demandantes, y doña Carmen Sacarello, cabe concluir únicamente que el demandado Roig es un tercero protegido contra la acción que ahora se intenta, según previsto en el artículo 36 de la Ley Hipotecaria, 30 L.P.R.A.

---

(¹³) *Nemo auditur* está consagrado en idéntica forma y en idénticos efectos en el Derecho americano. Williston, citando a Lord Mansfield, dice: "Ningún tribunal prestará su ayuda a un litigante que funda su causa de acción en un acto inmoral o ilícito. Si de la demanda misma o en alguna otra forma aparece que la causa de acción surgió *ex turpi causa* o mediante la infracción de una disposición del derecho positivo del país, el tribunal le negará su asistencia. El tribunal se basa en este principio, *no para favorecer al demandado*, sino por no amparar al demandante. (*On Contracts*, ed. 1947, tomo V, pág. 4561). Véanse también, *Restatement, Contracts*, § 598; *United States* v. *Guy W. Capps, Inc.*, 204 F.2d 655, 660 (1953); *Kaiser-Frazer Corp.* v. *Otis & Co.*, 195 F.2d 838 (1952); *Brand* v. *Elledge*, 360 P.2d 213 (Ariz., 1961); *Kukla* v. *Perry*, 105 N.W.2d 176 (1960).

Respecto a la aplicación del mismo principio en Argentina, véase, Salvat, *Derecho Civil Argentino*, vol. I, págs. 65 y ss.

sec. 61, en relación con el artículo 37 de la misma ley, 30 L.P.R.A. sec. 62.

Dicha inscripción se refiere a que Rubio "reconoce a favor de doña Carmen Sacarello . . . para su alimentación y la de su hijo menor la suma de . . . que se compromete a pagarle dentro del plazo de un año . . . cuya cantidad acepta la referida señora Carmen Sacarello obligándose a desistir del pleito de alimentos permanentes y a radicar una moción en el caso de El Pueblo de Puerto Rico contra Ricardo Rubio por abandono de menores haciendo constar bajo juramento que la sentencia ha sido satisfecha y cumplida en cuanto a la pensión . . ." En ninguna parte de la inscripción practicada se hace expresa referencia a que doña Carmen Sacarello o su hijo menor entonces renuncien a reclamar alimentos en el futuro al obligado. Solamente por vía de interpretación, y por cierto, bastante forzada, puede tal hecho deducirse de lo transcrito precedentemente. Ciertamente la inscripción registral es más compatible con la versión de que la transacción se refería a los alimentos devengados hasta la fecha del otorgamiento. ▆▆▆

Es sabido que afectan a tercero las acciones rescisorias o resolutorias "que deban su origen a causas que consten explícitamente del Registro," art. 37 de la Ley Hipotecaria, supra. *A contrario sensu*, cuando la causa de nulidad no consta explícitamente, cuando no aparece claramente del Registro, el tercero adquirente recibe la protección registral plena. Roca Sastre, en su monumental tratado *Derecho Hipotecario*, ed. 1954, vol. I, pág. 453 y ss., afirma que las causas de nulidad pueden constar en el Registro bien como "causa embebida en un asiento, por constituir una circunstancia integrante o derivada del acto registrado y estar expresada en el asiento como elemento inherente o reserva autenticada" o como "causa objeto de un asiento, por motivar la intención de éste o ser su objeto principal." En cuanto a la primera, "la causa destructora ingresa naturalmente o se manifiesta en el Re-

gistro sincrónica o simultáneamente con el acto que provoca dicho asiento." Y añade:

"Respecto de las causas embebidas en un asiento, constarán las mismas claramente en el Registro, cuando se trate de expresas y verdaderas *condiciones* incorporadas en el acto inscrito (por ejemplo, cuando conste el pacto comisorio en la compraventa, o el retracto convencional, etc.). Lo mismo ocurrirá cuando se trate de causas provenientes de *reservas o advertencias* claramente expresadas en el asiento, ya consten en el propio título, ya surjan del Registro. En cambio, no constarán tan explícitamente registradas, tales causas cuando se deriven de las *circunstancias integrantes,* naturales o pactadas, del acto inscrito, determinativas de la naturaleza y extensión del derecho registrado y de necesaria constatación registral conforme al art. 9⁹ de la Ley Hipotecaria, así como tampoco cuando en el Registro se consigne simplemente el *hecho o supuesto* que pueda dar origen a una nulidad o resolución (o rescisión)."

Cabe hacer referencia aquí a la sentencia de 30 de diciembre de 1944 (Jurisp. Civil, 2da. Serie, tomo VIII, pág. 920) que refiriéndose al adquirente de buena fe declara que deja de serlo aquel que tiene conocimiento suficiente de las causas que puedan invalidar el derecho del transferente, pero no en cambio el que se encuentra "tan solo en presencia de vagos indicios que a lo sumo le permitieran sospechar su existencia." (Págs. 454–455.)

Es de aplicación aquí el lenguaje de la opinión emitida en *Banco de Ponce* v. *Registrador,* 72 D.P.R. 128, 132 (1951) en donde se dijo que "La seguridad y certeza que deben aparecer de los libros del Registro en el estado de la titulación y cargas de fincas inscritas, y de las transacciones que las afectan, no permiten que sus asientos descansen en suposiciones o *interpretaciones.*" En igual forma las causas que han de menoscabar la fe pública registral no deben dejarse al arbitrio de interpretaciones que requieren conocimientos especializados, sino que deben aparecer diáfanamente del Registro mismo, especialmente cuando se trata de causas embebidas en un asiento que pasaron el tamiz de la calificación

del registrador sin que se advirtiera la supuesta causa de nulidad. Cobra actualidad lo expresado por el reconocido hipotecarista puertorriqueño, el Juez Asociado Sr. Texidor, en su opinión disidente en *Pérez Casalduc* v. *Díaz Mediavilla*, 41 D.P.R. 983 (1921) quién al referirse a las causas que constan explícitamente del Registro, indica que "no se trata de requerir el estudio de un abogado experto en Ley Hipotecaria, sino de que cualquiera persona de mediana instrucción pueda ver si resulta o no del registro, la causa de nulidad." El defecto o vicio debe ser "razonablemente aparente," *Ayllon* v. *González*, 28 D.P.R. 67, 76 (1920), confirmado en *Fernández & Bros.* v. *Ayllon y Ojeda*, 266 U.S. 144 (1924); cf. *Lizardi* v. *Caballero*, 65 D.P.R. 84 (1945); *Cruz* v. *Sucn. González*, 72 D.P.R. 308, 316 (1951); *Hernández* v. *Caraballo*, 74 D.P.R. 29 (1952); *Pérez* v. *Cancel*, 76 D.P.R. 667 (1954). ▄

Barrachina (*Comentarios a la Ley Hipotecaria*, ed. 1910, tomo I, pág. 273), después de discutir el alcance de la sinonimia entre resultar claramente y constar explícitamente, resume en su glosa el problema que venimos comentando, en esta forma:

"Cuando faltan la claridad y la expresión en las causas rescisorias o resolutorias que dan lugar a las acciones de sus respectivos nombres, enderezadas por igual a la invalidación del acto jurídico, no puede quedar perjudicado el tercero. Esas causas deben expresarse en la inscripción *de una manera concreta, terminante, que aleje toda duda, en evitación de peligros y engaños que corra el contratante de buena fe; han de impresionar los sentidos, saltar a la vista, sin necesidad de inferirlas, ni deducirlas.* El tercero ha de encontrar esa causa en la inscripción, de tal manera expresada, con tal claridad y precisión establecida, que no tenga más remedio que acatarla, rindiéndose forzosamente a sus consecuencias imperiosas; pues aunque la ignorancia de la ley no excusa su cumplimiento, el estudio de causas modificativas de la *facultas agendi* y la apreciación de su alcance no es labor de profano al derecho, sino de persona versada y entendida en éste; y no todos son Letrados para ir con-

sultando los libros del Registro y ver si por la procedencia de los bienes, tratándose de acciones resolutorias tácitas, se extingue en qué casos y de qué manera el derecho de la persona que transmitió o gravó el inmueble inscrito." (Énfasis nuestro.) ■

A la luz de todo lo expuesto no podemos negar al demandado Roig la protección de la fe pública registral. No constando explícitamente la causa de nulidad es improcedente contra él la acción que ahora se intenta por segunda vez. No parece ser demasiado tarde para recordar que, en términos generales, se recurre al Registro para buscar protección y no perjuicio.

### III

El tribunal de instancia concluyó que la deuda de $5,500 reconocida por el causante de los demandantes y cuyo pago se garantizó mediante la hipoteca constituida sobre la finca objeto de reivindicación cubría, entre otras cosas, pensiones ya devengadas en relación con las cuales puede transigirse libremente. Es preciso que examinemos la cuestión para disponer en forma adecuada de este litigio.

Manresa, al igual que los autores citados precedentemente, justifica la prohibición de transigir sobre alimentos futuros en "poderosas razones de moralidad que no pueden ocultarse," [14] o sea, la razón ya expuesta de que una transacción sobre los alimentos "equivaldría a renunciar en parte a la vida." Añade, sin embargo, que la prohibición no se extiende a los alimentos devengados o vencidos, pues desde el momento de su vencimiento forman parte del patrimonio del alimentista, o sea, constituyen un crédito que es susceptible de ser transigido. Igual criterio sustentan Scaevola [15] y Oyuelos, [16] quien funda además este aserto en la redacción del artículo 1713 que habla únicamente de los alimentos futuros, distinguiéndolos de los devengados. Indica además este autor

---

[14] *Op. cit.*, tomo XII, pág. 107.
[15] *Op. cit.*, tomo XXVIII, pág. 107.
[16] Ricardo Oyuelos, *Digesto*, ed. 1932, tomo VII, pág. 386.

que la prohibición de transigir ha de entenderse exclusivamente sobre lo esencial, o sea, el derecho a percibirlos, más no sobre lo accidental, como *"el tiempo de percibirlos,* de quién percibirlos y el lugar de su percepción."

Establecido ya que los alimentos devengados pueden ser objeto de transacción válidamente, precisa determinar el alcance de la prohibición sobre los alimentos futuros.  Oyuelos afirma que el artículo 1713 es consecuencia del 149, 31 L.P.R.A. sec. 568, que prescribe que el derecho a alimentos "no es renunciable ni transmisible a un tercero," y que tampoco está sujeto a compensación.  Como podrá observarse esta última disposición se refiere exclusivamente a los alimentos entre parientes, o sea, a los que se derivan de la relación de parentesco existente entre las partes, y que no incluye los debidos a la mujer divorciada.  La realidad es que al incorporarse el artículo 1814 del Código Civil español— equivalente, repetimos, al 1713 de Puerto Rico—no pudo haberse intentado comprender dentro de su ámbito la pensión alimenticia a la mujer divorciada, ya que por todos es sabido que el artículo 109 local que consagra el derecho de ésta no tiene concordante en España, en donde no se reconoce el divorcio como causa de disolución del matrimonio, sino que fue tomado del artículo 160 del Código Civil de Luisiana, Dart, *La Civil Code,* 2da. ed., pág. 102.([17])   Y en ese estado se ha sancionado la transacción del derecho de la mujer divorciada a recibir una pensión futura, *Abbott* v. *Abbott,* 2 So.2d 504 (La., 1941); *Brown* v. *Brown,* 153 So. 537 (1934).

Es interesante notar que Scaevola, al comentar la disposición aludida, cita a Planiol y Ripert, quien al referirse a la situación en Francia dice que "Esas reglas (prohibición de transacción sobre alimentos futuros) se aplican a la deuda alimenticia propiamente dicha, reconocida por la ley.  Pero

---

([17]) No ignoramos que el artículo 151 del Código Civil, 31 L.P.R.A. sec. 570, hace aplicables las disposiciones del Título VII del Libro I "a los demás casos en que por este código . . . se tenga derecho a alimentos".  Sin embargo, el mismo precepto admite la excepción del pacto entre las partes.

hasta la jurisprudencia hace una excepción, *en cuanto a la pensión alimenticia adeudada en caso de divorcio por el esposo y padre de su cónyuge inocente y necesitado;* en este caso convalida y hace definitiva toda transacción libremente consentida con referencia a esa pensión, presentando como razón que tiene el carácter de reparación de un perjuicio cuasi delictual (extracontractual) y que en ningún modo está prohibida la transacción por la reparación de un delito o de un cuasi-delito." (pág. 349)  A nuestro juicio, la pensión de la mujer divorciada como cónyuge inocente en la acción, puede asimilarse a los alimentos que se deben en virtud de convenio o por disposición testamentaria en relación con los cuales no se discute que pueden ser transigidos.([18])  Cf. *Viera* v. *Sucn. Goitía,* 55 D.P.R. 299, 302 (1939); *Valdés* v. *Hastrup,* 64 D.P.R. 595 (1945).  Siendo ello así, la señora Sacarello podía transigir válidamente en cuanto a los alimentos futuros. ■

Réstanos considerar el problema relativo a los alimentos futuros para el hijo menor.  No podemos sostener que el convenio tantas veces mencionado cubriera tal transacción (1) porque no hay una manifestación expresa al efecto; (2) ni se había entablado acción civil alguna a nombre o para beneficio del menor en reclamación de los mismos; y (3) todo cuanto podía concebiblemente cubrir el contrato efectuado entre las partes eran las pensiones devengadas hasta la fecha en que se firmó el mismo según determinadas por el tribunal como condición para la suspensión de la sentencia dictada en el proceso criminal por abandono de menores, en el cual la parte agraviada era el Pueblo.  Es por eso que la obligación

([18]) Scaevola, *op. cit.,* pág. 346, afirma que la prohibición se refiere "a los alimentos debidos por imperio de la ley misma, en cuanto resulta de los artículos 143 y siguientes del Código o sus análogos, pues si nacieran tan solo de contrato, no vemos razón sólida que impida hacerlos objeto de transacción . . ." Laurent es del mismo criterio, *Principios de Derecho Civil Francés,* ed. 1900, tomo XXVIII, pág. 399.  Véanse además las sentencias del Tribunal Supremo de España de 26 de octubre de 1897 y 10 de noviembre de 1948.

360

que asumió la señora Sacarello en cuanto a la sentencia dictada en dicho proceso se limitó a la de radicar una moción haciendo constar bajo juramento que la sentencia *ha sido satisfecha y cumplida en cuanto a la pensión.* Claramente sólo podía referirse a las pensiones devengadas.

No es necesario que discutamos el planteamiento sobre cosa juzgada en vista de las conclusiones a que hemos arribado.

*Se confirmará la sentencia dictada por el Tribunal Superior, Sala de Humacao, en 18 de febrero de 1957.*